1
2
3
4              UNITED STATES DISTRICT COURT
5             NORTHERN DISTRICT OF CALIFORNIA
6

7    MARGO PERRYMAN,                      Case No.  14-cv-02261-JST
          Plaintiff,
8
          v.                             **ORDER GRANTING IN PART AND**
9                                        **DENYING IN PART MOTIONS TO**
     LITTON LOAN SERVICING, LP, et al.,  **DISMISS**
10
          Defendants.                    Re: ECF Nos. 37, 43, 44.
11

12   **I.      INTRODUCTION**

13          In this proposed class action challenging Defendants' practices of instituting lender-placed

14   insurance ("LPI"), the four named defendants -- Southwest Business Corporation ("Southwest"),

15   Litton Loan Servicing, LP ("Litton"), Ocwen Loan Servicing, LLC ("Ocwen"), and American

16   Security Insurance Company ("ASIC") -- have filed three separate motions to dismiss.  ECF Nos.

17   37, 43 & 44.  The matter came for hearing on August 21.

18   **II.     BACKGROUND**

19          **A.      Procedural History**

20          Plaintiff Margo Perryman ("Plaintiff" or "Perryman") filed a proposed class action

21   complaint in May 2014.  Class Action Complaint ("Compl."), ECF No. 1.  The complaint brings

22   twelve causes of action: for "honest services fraud" against Defendants Litton and Southwest

23   under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), for honest services

24   fraud against Defendants Ocwen and ASIC, for mail and wire fraud under RICO against Litton

25   and Southwest, for mail and wire fraud against Ocwen and ASIC, for conspiracy to violate RICO

26   against Defendants Litton and Southwest, for conspiracy to violate RICO against Defendants

27   Ocwen and ASIC, for breach of fiduciary duty against Litton and Ocwen, for aiding and abetting a

28   breach of fiduciary duty against Southwest and ASIC, for "breach of contract, including breach of

United States District Court
Northern District of California

the implied covenant of good faith and fair dealing" against Litton and Ocwen, for unjust enrichment against all Defendants, for conversion against Litton and Ocwen, and for violation of California's Unfair Competition Law ("UCL"), Cal. Bus & Prof. Code §§ 17200, *et seq*, against all Defendants.

Defendant ASIC filed a motion to dismiss on June 20.  Motion to Dismiss Class Action Complaint by Defendant American Security Insurance Company ("ASIC Mot."), ECF No. 37. Defendant Southwest filed a motion to dismiss on June 30, and Defendants Litton & Ocwen jointly filed a third motion to dismiss the same day.  Southwest Business Corporation's Motion to Dismiss ("Southwest Mot."), ECF No. 43; Litton Loan Servicing, LP's and Ocwen Loan Servicing, LLC's Motion to Dismiss ("Litton & Ocwen Mot."), ECF No. 44.

**B.      Allegations in the Complaint**

Plaintiff Perryman's home is secured by a deed of trust signed by her and by lender Fremont Investment & Loan.  ¶ 33,[1] and Deed of Trust, Exh. A to Compl.  Under the deed of trust, Plaintiff is required to insure the property against the risks of fires, floods and/or other hazards. Id.  If Plaintiff fails to maintain the required coverage, the deed of trust allows the lender to obtain the required insurance coverage at Plaintiff's expense.  Id.  This is a common practice known as "lender-placed insurance" ("LPI").  ¶¶ 1, 4.

Specifically, section 5 of Plaintiff's deed of trust, entitled "property insurance," states:

> Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.  What Lender requires pursuant to the preceding sentences can change during the term of the Loan.
>
> [. . .]
>
> If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any

---

[1] All "¶" citations are to the operative complaint.

2

particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

Deed of Trust § 5. The deed goes on to provide that if the "Borrower fails to perform the covenants and agreements contained in this Security Instrument . . . then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property." Deed of Trust § 9. "Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument." Id.

On February 22, 2011, Litton was the servicer of Plaintiff's loan. ¶ 34. On that date, Plaintiff received a letter on Litton's letterhead, stating that Plaintiff's home was in a flood zone and that she was required by her deed of trust to provide proof of flood insurance. Id.[2] Plaintiff does not dispute that she never provided such proof of insurance.[3] Subsequently, Plaintiff received other letters on Litton letterhead, stating that flood insurance had been placed on her property and that her escrow account had been charged for the premium. ¶¶ 35-36.

On October 14, 2011, Litton and Ocwen sent Plaintiff a notice stating that effective November 1, 2011, Litton would transfer the servicing of Plaintiff's account to Ocwen. ¶ 37. "On November 2, 2011, Litton sent Plaintiff a notice stating that due to the transfer of Plaintiff's

---

[2] Plaintiff alleges that it was "Southwest, using Litton letterhead," who sent this letter. For reasons more fully discussed *infra* at III-B, the Court does not consider this a well-pled allegation entitled to a presumption of truth.

[3] Plaintiff does not, at least in this lawsuit, dispute that she was required under her deed of trust to purchase flood insurance and that her lenders were entitled to purchase it and charge her at least some amount for the cost of obtaining flood insurance if she failed to do so.

account to Ocwen, her flood insurance was cancelled effective November 1, 2011, but that an earned premium of $463.43 was charged to her account for the time the policy was in force." Id. Litton sent subsequent notices to Plaintiff that it had established new LPI on her home with insurer ASIC, and charged her escrow account for those premiums.  ¶¶ 38-41.

Plaintiff alleges that every time Southwest or ASIC force-places an insurance policy on one of Litton or Ocwen borrowers' properties, they also kick back a portion of the premium to Litton, Ocwen, or one of their affiliates.  ¶¶ 108-110, 119-122.  Litton and Ocwen perform no work and provide no services to earn the "costs" or "expenses." ¶ 9.  Instead, Southwest and ASIC make these payments to Litton and Ocwen for the sole purpose of securing the privilege of force-placing insurance on a designated portion of Litton and Ocwen's portfolio.  Id.  "As a result of these practices, borrowers often end up paying two to ten times as much for force-placed insurance than for insurance they could get on the open market." ¶ 15.

### C.    Requests for Judicial Notice

In addition to the complaint, the parties have proposed that the Court also consider the following documents, to which the opposing party has not objected:

- Exhibits to the Declaration of Rebecca Voyles ("Voyles Decl."), ECF Nos. 37-1 through 37-4.  These are public records of form and premium rate filings made to and approved by the California Department of Insurance, which are public records noticeable pursuant to Rule 201(b) of the Federal Rules of Evidence.  See Leghorn v. Wells Fargo Bank, N.A., 950 F. Supp. 2d 1093, 1106 (N.D. Cal. 2013).  The documents can also be considered to the extent they are relevant to a dispute over Plaintiff's Article III standing and the Court's subject-matter jurisdiction.  See Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir.2004) ("In resolving a [Rule 12(b)(1)] factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment."); see also Kingman Reef Atoll Investments, L.L.C. v. United States, 541 F.3d 1189, 1196-97 (9th Cir. 2008) "[I]n general, a district court is permitted to resolve disputed factual issues bearing upon subject matter jurisdiction in the context of a Rule 12(b)(1) motion").

United States District Court
Northern District of California

4

United States District Court
Northern District of California

- The Declaration of Ronald K. Wilson ("Wilson Decl."), and exhibits A-J thereto.  These are ASIC's records of correspondence sent on Ocwen letterhead to Perryman (ECF No. 37-5).  ASIC argues that these are noticeable because the complaint refers to correspondence sent by the servicers to Perryman, and no party contests the letters' authenticity.  ASIC Mot., at 3, n. 1 (citing Davis v. HSBC Bank Nevada, N.A., 691 F.3d 1152, 1160 (9th Cir. 2012)).  While Plaintiff objects to the Court considering very similar correspondence submitted by Litton & Ocwen during the period that Southwest allegedly was the insurer on her home, see infra, Plaintiff has not disputed the authenticity of the correspondence submitted by ASIC and she has not objected to the Court considering it.  To the contrary, she quotes extensively from the declaration and attached letters in her opposition brief, arguing that they support the viability of her claims.  Plaintiff's Opposition to American Security Insurance Company's Motion to Dismiss ("Opp. to ASIC"), ECF No. 53, at 10:18-24, 11:27, 12:18-13:6, 16:6-19, 22:19-25.

- Paragraphs 17-21 of the Wilson Declaration, and Exhibit J thereto, which provide additional information about ASIC's rate filings with the California Department of Insurance.  This information can be considered to the extent it is relevant to the Court's consideration of Plaintiff's standing.

- The declaration of Plaintiff Margo Perryman (ECF No. 55).  Plaintiff submitted this document solely to dispute the noticeability of documents submitted by Litton & Ocwen, and the Court addresses it more fully infra.

- Several other documents which can be considered to the extent they are relevant to ASIC's standing argument, and/or because they are appropriately noticeable public records:

  o Exhibits A-B to ASIC's Request for Judicial Notice ("ASIC RJN"), copies of a publicly filed order issued by the California State Insurance Commissioner, and a publicly filed order entered by the Superior Court of the State of California for the County of San Diego in Conley v. Norwest Mortgage Inc., Case No. N73741 on January 10, 2000 (ECF No. 38).

  o The Declaration of Kevin Vennefron ("Vennefron Decl."), and Exhibit A thereto, a

1    filing by American Modern Home Insurance Company with the California

2    Department of Insurance (ECF No. 45).

3    o   Exhibits A-E to Plaintiff's Request for Judicial Notice: a copy of a publicly filed

4        Consent Order, Fannie Mae's December 18, 2013 Servicing Guide, pages of a

5        February 26, 2014 Consent Judgment filed in the United States District Court for

6        the District of Columbia, and pages of Fannie Mae's March 14, 2012 Single Family

7        2012 Servicing Guide (ECF No. 56).

8    o   Exhibits 1 & 2 to Litton & Ocwen's Request for Judicial Notice, copies of

9        complaints filed in other courts (ECF No. 63).

10   Litton & Ocwen have also requested judicial notice of the declaration of Kevin Flannigan

11   ("Flannigan Decl.") and exhibits thereto, which are Ocwen's records of correspondence sent to

12   and from Perryman regarding her obligation to purchase flood insurance.  ECF No. 44-1.  Litton &

13   Ocwen argue that the Court can consider these documents because they are incorporated by

14   reference in the complaint.  Litton & Ocwen Mot., at 4, n. 1.  But the complaint nowhere refers to

15   correspondence sent *by* Perryman.  Therefore, the Court will not consider Exhibits B, E, G, K, M,

16   N, O or P to the Flannigan Declaration.

17   As for the documents sent *to* Perryman, Plaintiff does not oppose the Court considering

18   four letters which are specifically mentioned in the complaint, Exhibits A, D, H and J to the

19   Flannigan Declaration.  Plaintiff's Opposition to Litton Loan Servicing, LP's and Ocwen Loan

20   Servicing, LLC's Motion to Dismiss ("Opp. to Litton & Ocwen"), at 6 (ECF No. 52).  She

21   opposes the Court taking notice of other letters sent to Plaintiff, Exhs. C, F, I, L, Q and R to

22   Flannigan Decl., which she argues are not referenced in the complaint.  But in fact, the complaint

23   alleges that Defendants sent out "boilerplate 'cycle letters'" to borrowers, and that representations

24   in those letters contained material omissions and misrepresentations which form the basis of her

25   claims.  ¶¶ 6-7, 13, 65, 188.  Plaintiff did not object to the noticeability of similar letters attached

26   as exhibits to the Wilson Declaration.  Since the complaint refers to Defendants' correspondence

27   to her regarding their LPI practices, since those materials are central to her misrepresentation-

28   based claims, and because Plaintiff does not dispute the letters' authenticity, the Court will

1    consider them.  See Davis, 691 F.3d at 1160.

2           In addition, while Plaintiff does not dispute the authenticity of a June 16, 2011 letter, Exh.

3    J to Flannigan Decl., Plaintiff contests the authenticity of a "certificate of insurance" that Litton &

4    Ocwen claim were included as an attachment to that letter.  Opp. to Litton & Ocwen, at 6:17-24.

5    Plaintiff's counsel argues that "[t]his document is not in Plaintiff's records and Plaintiff questions

6    its authenticity."  Id.  But Plaintiff produces no evidence supporting her counsel's statement --  in

7    the Perryman Declaration, she says nothing about her record-keeping habits and whether the

8    attachment is within her records.  The Perryman Declaration provides additional evidence Plaintiff

9    argues is probative of whether Southwest was the insurer of her property, but this "is a matter

10   unrelated to . . . [the documents'] authenticity—i.e., whether the documents are 'what its

11   proponent claims.'"  Davis, 691 F.3d at 1161 (citing Las Vegas Sands, LLC v. Nehme, 632 F.3d

12   526, 533 (9th Cir.2011).  The Court will consider both the Perryman Declaration and Exhibit J to

13   the Flannigan Declaration in conjunction with this motion.

14          Finally, after briefing was complete, on the morning of the hearing of the motion to

15   dismiss, Plaintiff requested judicial notice of an August 4, 2014 public letter from the New York

16   State Department of Financial Services to the General Counsel of Ocwen Financial Corporation.

17   ECF No. 70.  The Court will not consider this document because it was filed in violation of Civil

18   Local Rule 7-3, which, with exceptions that do not apply here, precludes the filing of

19   supplementary materials "without prior Court approval."  Civil L.R. 7-3(d).  Had Plaintiff sought

20   leave of Court, the Court could take notice of the existence of the letter pursuant to Rule 201(b) of

21   the Federal Rules of Evidence, but could not assume the truth of facts asserted by the letter's

22   author, since those facts are subject to reasonable dispute.  The letter is therefore of little probative

23   value.

24      **D.     Legal Standards**

25          ASIC moves to dismiss under both Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of

26   Civil Procedure.

27          **1.     12(b)(1)**

28          A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) tests the subject

United States District Court
Northern District of California

7

matter jurisdiction of the Court.  When subject matter jurisdiction is challenged, "the party seeking to invoke the court's jurisdiction bears the burden of establishing that jurisdiction exists." Scott v. Breeland, 792 F.2d 925, 927 (9th Cir. 1986); see also Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).  "[I]n general, a district court is permitted to resolve disputed factual issues bearing upon subject matter jurisdiction in the context of a Rule 12(b)(1) motion unless 'the jurisdictional issue and the substantive issues are so intermeshed that the question of jurisdiction is dependent on decision of the merits.'" Kingman Reef Atoll Investments, L.L.C., 541 F.3d at 1196-97 (9th Cir. 2008) (quoting Thornhill Publ'g Co. v. Gen. Tel. & Elecs. Corp., 594 F.2d 730, 735 (9th Cir.1979)).

"Article III's case-or-controversy requirement . . . provides a fundamental limitation on a federal court's authority to exercise jurisdiction . . . [and] 'the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III.' " Nuclear Info. & Res. Serv. v. Nuclear Regulatory Comm'n, 457 F.3d 941, 949 (9th Cir. 2006) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)).

### 2.     12(b)(6)

"A district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is proper if there is a 'lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.'" Conservation Force v. Salazar, 646 F.3d 1240, 1242 (9th Cir. 2011) (quoting Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1988)).

On a motion to dismiss, courts accept the material facts alleged in the complaint, together with reasonable inferences to be drawn from those facts, as true. Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001).  However, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "[T]o be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir.

2011).

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). "[T]he factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." Starr, 652 F.3d at 1216.

**E.      Jurisdiction**

Assuming Plaintiff has standing, see Part III-A, infra, the Court has subject-matter jurisdiction over Plaintiff's RICO claims pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964.  The Court also has jurisdiction over the entirety of the Complaint pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d)(2) and (6), because Plaintiff seeks to certify a class whose aggregate claims exceed $5 million, exclusive of interest and costs, and because at least one member of the proposed class is a citizen of a different state than the Defendants.

**III.   ANALYSIS**

The three motions raise numerous shared, and other distinct, grounds for dismissal.   The Court addresses each in turn.

**A.      The Filed-Rate Doctrine**

All Defendants challenge the sufficiency of the complaint by invoking the "filed rate doctrine."  Defendant ASIC moves pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, arguing that under the doctrine, Plaintiff lacks Article III standing to bring any of her claims.  Defendants Southwest and Litton & Ocwen move to dismiss pursuant to Rule 12(b)(6), arguing that because of the doctrine, the complaint fails to state a claim.  Because Article III standing is a threshold jurisdictional question, the Court will address this argument first, assuming arguendo that if the doctrine applies, it deprives Plaintiff of Article III standing.  See Steel Co. v. Citizens for a Better Env., 523 U.S. 83, 94 (1998).[4]

_____

[4] In fact, however, the Court doubts that, even when the doctrine does apply, it is an issue of standing as opposed to the merits of the claim.  The Court is aware that at least district court has characterized the filed-rate doctrine as an issue of standing.  Morales v. Attorneys' Title Ins. Fund,

United States District Court
Northern District of California

"The filed rate doctrine, also known as the 'Keogh doctrine,' is a judicially created concept which originated in Keogh v. Chicago & Northwest Railway, 260 U.S. 156 (1922)."  Allan Kanner, The Filed Rate Doctrine and Insurance Fraud Litigation, 76 N.D. L. REV. 1, 32 (2000). The doctrine "arises from decisions interpreting federal statutes that give federal agencies exclusive jurisdiction to set rates for specified utilities, originally through rate-setting procedures involving the filing of rates with the agencies."  E. & J. Gallo Winery v. Encana Corp., 503 F.3d 1027, 1033 (9th Cir. 2007).  "At its most basic, the filed rate doctrine provides that state law, and some federal law (e.g. antitrust law), may not be used to invalidate a filed rate nor to assume a rate would be charged other than the rate adopted by the federal agency in question."  Wah Chang v. Duke Energy Trading & Mktg., LLC, 507 F.3d 1222, 1225 (9th Cir 2007) (quoting Transmission Agency v. Sierra Pac. Power Co., 295 F.3d 918, 929–30 (9th Cir. 2002).  "It has generally been recognized that there are three 'purposes' or 'governmental interests' which justify or support the

_____

Inc., 983 F. Supp. 1418, 1429 (S.D. Fla. 1997).  "[T]here is, however, persuasive case law which holds that the filed rate doctrine is not a subject matter jurisdiction issue, but is rather a defense on the merits."  Hoover v. HSBC Mortgage Corp. (USA), __ F.Supp.2d __, No. 3:13-cv-149 MAD/DEP, 2014 WL 1280441, at *8 (N.D.N.Y. Mar. 27, 2014) (citing Curtis v. Cenlar FSB, No. 13-cv-3007 DLC, 2013 WL 5995582, at *2 (S.D.N.Y. Nov. 12, 2013).  Defendants "reason that because . . . [the plaintiff] loses on the merits, he has not suffered any 'cognizable injury that is traceable to the acts of the . . . defendants and he lacks standing to sue them.'"  Curtis, 2013 WL 5995582, *2.  "But this reasoning would allow any Rule 12(b)(6) motion to be restyled as a Rule 12(b)(1) standing motion."  Id.  "While standing and merits questions frequently overlap, standing is fundamentally about the propriety of the *individual* litigating a claim irrespective of its legal merits, while a Rule 12(b)(6) inquiry is concerned with the legal merits of the claim itself."  Id. (emphases in the original).  "Here, the defendants are not contending that . . . [the plaintiff] is the wrong individual to bring these legal claims; they are arguing that the claims are simply not legally cognizable."  Id.

ASIC has not directed the Court to any Ninth Circuit authority directly addressing this question. In 2007, the Ninth Circuit applied the doctrine in considering the appeal of a filed-rate doctrine dismissal which had been entered pursuant to Rule 12(b)(1).  Wah Chang v. Duke Energy Trading & Mktg., LLC, 507 F.3d 1222, 1225 (9th Cir. 2007).  But more recently, the Ninth Circuit considered a filed-rate doctrine dismissal that had been entered under Rule 12(b)(6).  Carlin v. DairyAmerica, Inc., 705 F.3d 856, 866-67 (9th Cir. 2013) cert. denied, 134 S. Ct. 116 (U.S. 2013). Whether or not Plaintiff's claims fail because of the filed-rate doctrine, the Court sees nothing about her relationship to her asserted harm that deprives this Court of jurisdiction to address the question she presents for adjudication.  Ultimately, the Court need not decide the question in this motion because the Court concludes, even after considering all relevant evidence and assuming the burden is properly placed on Plaintiff, that the filed-rate doctrine does not bar Plaintiff's claims.

United States District Court
Northern District of California

filed rate doctrine": (1) the fact that "federal law require[s] the primacy of filed rates and tariffs," (2) "federal preemption (or the supremacy of federal law)," and (3) "deference to federal agency expertise (or primary jurisdiction)."  Carlin v. DairyAmerica, Inc., 705 F.3d 856, 867-69 (9th Cir. 2013) cert. denied, 134 S. Ct. 116 (U.S. 2013).

Notwithstanding the "expansive reading and application" the filed rate doctrine has been given in this circuit, id. at 869, every court in this district to address the issue has concluded that the filed-rate doctrine does not bar LPI claims like the ones brought in this action.  Cannon v. Wells Fargo Bank, N.A., No. 12-1376 EMC, 2014 WL 324556, at *4-6 (N.D. Cal. Jan. 29, 2014); Cannon v. Wells Fargo Bank, N.A., 917 F.Supp.2d 1025, 1036-38 (N.D. Cal. 2013); Ellsworth v. U.S. Bank, N.A., 908 F.Supp.2d 1063, 1081-83 (N.D. Cal. 2012); Leghorn, 950 F.Supp.2d at 1115-1116; Ellsworth v. U.S. Bank, N.A., __ F.Supp.2d __, No. 12-02506 LB, 2014 WL 1218833, at *17-18 (N.D. Cal. Mar. 21, 2014).

Defendants argue that the filed rate doctrine applies here because the charges applied to Plaintiff's escrow account are consistent with the amounts the California Department of Insurance has approved as reasonable insurance rates under California law.  See Cal. Ins. Code § 1861.05(a).  Defendants have submitted evidence, undisputed by Plaintiff, that this is true.  Defendants argue that the filed rate doctrine requires this court to dismiss all of Plaintiff's claims, state and federal, since they would interfere with California's regulatory authority.

But the Ninth Circuit has described the filed rate doctrine as "a judicial creation that arises from decisions *interpreting federal statutes* that give *federal agencies* exclusive jurisdiction to set rates . . .."  Carlin, 705 F.3d at 867 (quoting E. & J. Gallo Winery, 503 F.3d at 1033 (emphases added).  The initial rationale for the doctrine was that "*federal law* required the primacy of filed rates and tariffs," and after this basis for the rule was established, there developed "two additional and related justifications for the doctrine, i.e., *federal* preemption (or the supremacy of federal law) and deference to *federal* agency expertise (or primary jurisdiction)."  Carlin, 705 F.3d at 868 (emphases added).  None of these three rationales are directly implicated when the agency regulating rates is a state agency.

In all of the Supreme Court and Ninth Circuit cases cited by Defendants, courts applied the

United States District Court
Northern District of California

filed-rate doctrine because protecting a federal agency's regulatory authority was necessary to effectuate the purposes of a federal statute.  See Keogh, 260 U.S. at 160 (interpreting the Interstate Commerce Act and the regulatory authority of the Interstate Commerce Commission); Square D Co. v. Niagara Frontier Tariff Bureau, Inc., 476 U.S. 409, 411-12 (1986) (same); Wah Chang, 507 F.3d at 1224 (9th Cir. 2007) (considering "tariffs approved by the Federal Energy Regulatory Commission").  Carlin considered the U.S. Department of Agriculture's regulatory authority under the federal Agricultural Marketing Agreement Act and the Dairy Market Enhancement Act - and found that, even then, the filed rate doctrine did not preempt all arguably inconsistent state-law claims.  705 F.3d at 858-63, 882.

When a federal statute grants strong and pervasive authority to a federal agency, it is understandable why courts interpret the statute to supersede other laws that would stand in the statute's way.  Inconsistent state laws are preempted under the Supremacy Clause, and inconsistent federal laws are interpreted to be subordinate to the "stronger" statute.  But it is unclear why the California Insurance Commissioner's regulatory authority would impede the otherwise appropriate reach of a federal statute.  By arguing that California's state-law regulatory authority bars even otherwise valid federal RICO claims, Defendants' arguments would seem to stand the Supremacy Clause on its head.

Several out-of-circuit cases have held that since utility regulation is an area of traditional state authority, even a federal law like RICO must be interpreted to be consistent with a state regulatory scheme absent a clear statement that Congress intended to alter the traditional federal-state balance.  Wegoland, Ltd. v. NYNEX Corp., 806 F. Supp. 1112, 1115-16 (S.D.N.Y. 1992) aff'd, 27 F.3d 17 (2d Cir. 1994) ("Keogh's rationale applies equally strongly where state law creates a state agency and statutory scheme pursuant to which the state agencies determine reasonable rates"); Taffet v. S. Co., 967 F.2d 1483, 1494 (11th Cir. 1992) (filed rate doctrine "applies with equal force to preclude recovery under RICO whether the rate at issue has been set by a state rate-making authority or a federal one"); H.J. Inc. v. Nw. Bell Tel. Co., 954 F.2d 485, 495 (8th Cir. 1992) ("allowing a RICO action . . . would similarly disrupt the state administrative process and constitute a 'collateral attack on a rate order,' contrary to state law") (quoting H.J.,

1   Inc. v. Nw. Bell Corp., 420 N.W.2d 673, 677 (Minn. Ct. App. 1988)).  These cases are not binding

2   on courts in this circuit, and this Court does not find them persuasive.

3          Even assuming that the Ninth Circuit would follow this line of authority, however, the

4   question of whether the filed-rate doctrine applies turns on the extent of the state regulatory

5   scheme.  "Overbroad application of the filed rate doctrine is especially inappropriate where

6   regulators have limited jurisdiction."  Jim Rossi, Why the Filed Rate Doctrine Should Not Imply

7   Blanket Judicial Deference to Regulatory Agencies, ADMIN. & REG. L. NEWS, Fall 2008, at 11, 12.

8   The question is one of state-law statutory interpretation, and it depends upon how broadly the state

9   intends for its regulatory authority to reach.  When state-law regulatory authority provides the

10  basis of the filed rate doctrine, the doctrine should be based on a careful analysis of the text and

11  purpose of the underlying state law, rather than blanket application of the filed rate doctrine to all

12  challenges which touch a regulated industry.  Otherwise, a court might end up curtailing a state's

13  valid laws in order to preserve a regulatory authority that the state does not even exercise.  In

14  addition, while "[t]he filed rate doctrine has been given an expansive reading and application in

15  this Circuit," the Ninth Circuit has also held that in a given arena, it is "'open to repudiation by the

16  . . .'" relevant agency.  Carlin, 705 F.3d at 869 (quoting Verizon Del., Inc. v. Covad Commc'ns

17  Co., 377 F.3d 1081, 1089 (9th Cir. 2004)).

18         Here, the California Insurance Commissioner has specifically disclaimed any authority to

19  regulate the conduct challenged in the complaint.  In 2001, California Superior Court Judge David

20  Moon stayed a very similar LPI case and sought guidance from the Insurance Commissioner

21  regarding actions Judge Moon understood to fall within the Commissioner's authority to regulate.

22  Exh. A to Plaintiffs' RJN, at 3; In the Matter of the Rates, Rating Plans, or Rating Systems of

23  American Security Insurance Company, Cal. Ins. Comm. No. OV-01-01-8309 (Apr. 18, 2001)

24  (emphasis added).  "Petitioners and Judge Moon . . . asked whether the rates approved by the

25  Department of Insurance 'include charges which are improperly passed on by lenders to FPI

26  purchasing borrowers.'"  Id. at 6.  The Insurance Commissioner responded that he "cannot

27  address" that question.  Id.  "Insofar as Petitioners ask the Department to decide whether premium

28  charges 'are improperly passed on' to Petitioners, the Commissioner cannot and does not express

United States District Court
Northern District of California

13

1   an opinion." Id.  "The jurisdiction of the Commissioner extends to issues concerning the

2   reasonableness of insurance rates vis-à-vis Respondent as the Insurer and Norwest as the insured."

3   Id.  "The Department has no jurisdiction to decide the scope of charges which would be

4   reasonable as between a lender and its borrower."  Id.

5        In other words, another court already attempted to defer to the Insurance Commissioner on

6   exactly the type of claim before this court, and the Commissioner refused to accept the offered

7   deference.  It is for this reason that courts of this district held that the filed-rate doctrine does not

8   bar claims brought by homeowners, because "they are not the ratepayers."  Ellsworth 2014 WL

9   1218833.

10       Defendants argue that Plaintiff cannot avoid the filed rate doctrine by merely describing

11  her suit as a challenge to the servicer's behavior rather than the reasonableness of the insurance

12  rate.  They argue that "[t]he underlying conduct does not control whether the filed rate doctrine

13  applies."  Coll v. First Am. Title Ins. Co., 642 F.3d 876, 890 (10th Cir. 2011).  "Rather, the focus .

14  . . is the impact the court's decision will have on agency procedures and rate determinations."  Id.

15  Defendants argue that the doctrine applies whenever "it would be necessary for this court to

16  determine a reasonable rate and subtract it from the premium."  Decambaliza v. QBE Holdings,

17  Inc., No. 13-cv-286, 2013 WL 5777294, at *7 (W.D. Wis. Oct. 25, 2013).  The doctrine bars all

18  claims "which necessarily hinge on a claim that the . . . approved rate was too high and would,

19  therefore, undermine . . . [the agency's] . . . authority."  Wah Chang, 507 F.3d at 1225-26.  But if

20  the Insurance Commissioner felt that allowing civil actions of this type would undermine the

21  agency's authority to regulate insurance rates, he would have seized the opportunity to express an

22  opinion about the reasonableness of rate pass-alongs when asked directly to do so.  The Court will

23  not be more concerned with the agency's authority than the agency is itself.

24       Just as Plaintiff may not re-characterize the nature of her action to avoid the filed rate

25  doctrine, neither can Defendants re-characterize the nature of *Plaintiff*'s claim.  Plaintiff does not

26  dispute the reasonableness of rates charged for insurance.  She disputes the amount of that rate

27  which can be passed on to her under the terms of her contract with Defendants.

28       To see the truth of this, imagine Plaintiff's breach of contract were much stronger.

United States District Court
Northern District of California

Imagine the deed of trust unambiguously promised that the servicers would pass along no more than $100 of the annual premium to the lender if insurance were force-placed.  And then imagine the servicers actually assessed the escrow account a $300 premium, in clear breach of their promise, but still at a rate lower than the one approved by the Insurance Commissioner.  Would Defendants still object that her breach of contract claim would be barred?  After all, refunding her the $200 she would clearly be owed in that situation would require a court to "determine a reasonable rate and subtract it from the premium."

It is true that in <u>Wah Chang</u>, the Ninth Circuit held that a retailer at one remove from the regulated purchase could not challenge the reasonableness of a filed rate.  507 F.3d at 1226-27.  But Plaintiff is not a retailer purchasing a regulated product who seeks to challenge the regulated price of that commodity.  The more reasonable reading of <u>Wah Chang</u> is that wholesale and retail customers were both within the intended ambit of the federal regulatory scheme at issue in that case.  The Court doubts that the Ninth Circuit intended from this holding to insulate all regulated parties from liability if they passing along the costs of the regulated rate to others in ways that are unlawful.  In any case, <u>Wah Chang</u> did not involve an agency that had clearly repudiated any jurisdiction over the actions the plaintiff had sought to challenge.  Plaintiff cannot be deprived of her claims by a state regulatory scheme that makes no effort to regulate the actions in question.

The filed rate doctrine does not bar Plaintiff's claims.

### B.     Claims against Southwest

Plaintiff alleges that "[s]ince at least 2011, Litton was a party to a purchase agreement with Defendant Southwest Business Corporation," through which Southwest was "given the exclusive right to force insurance on property securing a loan within the portfolio when a borrower's insurance lapses or the lender determines the borrower's existing insurance is inadequate."  ¶ 6.  Plaintiffs also allege that it was Southwest, "using Litton letterhead," who sent notices to Plaintiff advising her of her obligation to provide proof of flood insurance, and then, when she did not comply, advising her that it would charge her for lender-placed insurance.  ¶¶ 34-36, 108.

But it appears from the record that Southwest was not the insurer of Plaintiff's property.  An Ocwen employee with knowledge of Ocwen's business records has declared that the true and

United States District Court
Northern District of California

correct copy of the June 26, 2011 letter referenced in the complaint included an attached "Evidence of Flood Insurance," which states that American Modern Home, not Southwest, was the insurer placed on the property.  Flannigan Decl. ¶¶ 1-5, 15, and Exh. J thereto.  The letter, which Plaintiff does not dispute is authentic, lists an insurance certificate number of "LLW001121," and a coverage amount of $63,138.75.  Exh. J to Flannigan Decl.  The same certificate number and coverage amount appear on the Certificate of Insurance.  Id.

Plaintiff argues that the authenticity of the certificate of insurance is in question, but her only evidence of that is her declaration that she "recently contacted Ocwen and asked them what company issued the force-placed insurance policy on my home when Litton serviced my loan in 2011," and that "[t]he Ocwen representative informed me 'SWBC,' or Southwest Business Corporation, issued the insurance policy."  Perryman Decl. ¶ 2.  This is inadmissible hearsay, no foundation has been laid for the basis of the unnamed Ocwen representative's knowledge, and Perryman's declaration does not provide any further details regarding the date of the call and to whom Perryman spoke.

At oral argument, Plaintiff's counsel conceded that "it looks like we got the wrong insurer."  The Court finds that, when considered together with other documents appropriately considered on a motion to dismiss, the complaint does not allege facts from which it is plausible to infer that Southwest is responsible for the actions challenged in the complaint.  Since this entitles Southwest to dismissal of all claims asserted against it, the Court does not further consider any other Southwest arguments for dismissal.

### C.    Breach of Contract / Breach of the Covenant of Good Faith and Fair Dealing

The complaint brings a claim for "breach of contract, including breach of the implied covenant of good faith and fair dealing" against Defendants Litton and Ocwen.  Plaintiff alleges breach of sections 3, 5 and 9 of the deed of trust. ¶¶ 158-60.[5]

Section nine provides that "Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the property and rights under this Security Instrument,"

---

[5] In her opposition brief, Plaintiff also suggests Litton and Ocwen breached section 14 of the deed of trust, but the Court does not consider this argument since it is not in her complaint.

and section five, which gives the lender the right to impose LPI, states that "Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained." Plaintiff alleges that at least some of the charges applied to her account were neither attributable to any actual costs incurred by the lender in obtaining insurance, nor to any costs charged by the insurer for valuable services in providing insurance coverage. She alleges that what Defendants deemed the "cost" of the insurance charged by the insurers was an amount essentially fixed between the insurer and the lender, who were free to set any price as the "cost" of insurance since they knew that neither of them would be ultimately responsible for paying it. Under one plausible reading of the contractual language, a reasonable borrower would not have understood herself to be agreeing to pay these types of charges when she agreed to be held responsible for the "cost of the insurance coverage."

Moreover, even if Litton and Ocwen's alleged actions do not violate the express terms of the deed of trust, Plaintiff has plausibly alleged actions that could be considered a breach of the covenant of good faith and fair dealing. "The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. Carma Developers (Cal.), Inc. v. Marathon Dev. California, Inc., 2 Cal. 4th 342, 372 (1992). "Such power must be exercised in good faith." Id. To the extent that Litton & Ocwen had discretion within the contract to assess a cost of acquiring insurance against Plaintiff's escrow account, Plaintiff has plausibly alleged that, by conspiring with insurers to fix an artificial "cost" of acquiring insurance, Litton & Ocwen failed to exercise that discretion in good faith. Accord Leghorn, 950 F. Supp. 2d at 1120; Ellsworth v. U.S. Bank, N.A., 908 F. Supp. 2d at 1085; McNeary-Calloway v. JP Morgan Chase Bank, N.A., 863 F. Supp. 2d 928, 956 (N.D. Cal. 2012).

Litton & Ocwen move to dismiss all claims in the complaint "for the reasons stated by the Seventh, Tenth and Eleventh Circuits," citing Cohen v. American Sec. Ins. Co., 735 F.3d 601 (7th Cir. 2013), Feaz v. Wells Fargo Bank, N.A., 745 F.3d 1098 (11th Cir. 2014), and Anapoell v. American Express Bus. Fin. Corp., No. 2:07-cv-198-TC, 2008 WL 2225849 (D. Utah 2008), aff'd, No. 08-4114, 2009 WL 766532, at *2 (10th Cir. Mar. 24, 2009) (unpublished). These three circuit court decisions affirmed the dismissal of contractual claims in similar situations, on the grounds

United States District Court
Northern District of California

17

1    that nothing in the lenders' contracts prohibited them from receiving fees or commissions from the

2    insurers whose policies they required plaintiffs to buy.  See, e.g., Cohen, 735 F.3d at 612.

3           Plaintiff argues that Cohen is distinguishable.  As she reads Cohen, the court understood

4    the plaintiffs in that case to be merely "calling" the commissions "kickbacks," without explaining

5    why they deserved that designation.  Perryman argues that the Cohen plaintiffs did not allege

6    specifically that the "commissions" the insurers paid to the lender were unearned payment, paid by

7    the insurer solely for the purposes of being the designated forced-place insurer for a portion of the

8    servicer's portfolio.  But it appears from the underlying complaint in that case that the plaintiff in

9    Cohen did make that allegation, if perhaps in not so many words.  Exh. 1 to Litton & Ocwen's

10   RJN.  In any case, it is doubtful that these allegations would have made much difference in the

11   Cohen court's analysis, since Cohen held that "[t]he defining characteristic of a kickback is

12   divided loyalties," and the lender "was not subject to divided loyalties; rather, it was subject to an

13   undivided loyalty to itself, and it made this clear from the start."  735 F.3d at 611.  Plaintiff does

14   successfully distinguish the case insofar as her complaint alleges that Defendants made material

15   misstatements, ¶¶ 108-110, 119-22, which the Cohen plaintiffs did not.  Id. at 613

16          Feaz is more distinguishable, since the opinion itself did not directly engage the argument

17   that the lender breached its mortgage agreement by entering into agreements with insurers that set

18   artificial "costs" of insurance.  Feaz only considered the question of whether the lender breached

19   the contract "by demanding more flood insurance than the Secretary of HUD requires and by

20   force-placing the insurance when she failed to get it."  745 F.3d at 1104.  It echoed Cohen's

21   conclusion that kickbacks require divided loyalty, but only in concluding that the plaintiffs had

22   failed to plead a claim of breach of fiduciary duty.  (The Court agrees with that conclusion, see

23   infra, at III-E.)  As for Anapoell, Plaintiff concedes it is indistinguishable and urges the Court not

24   to follow it.

25          Considering the cases as a group, and to the extent they are on all fours, this court does not

26   follow them.  The Court agrees that the payments might not be appropriately characterized as

27   "kickbacks," since that term usually requires divided loyalty.  However, it does not necessarily

28   follow from this that that the payments were contractually authorized or assessed in conformance

United States District Court
Northern District of California

18

with the covenant of good faith.  The aspect of the three opinions Litton & Ocwen most urge this Court to apply is their conclusion that since the deed of trust advised Plaintiff that the cost of LPI might be significantly higher, and since nothing in the deed of trust specifically prohibited the receipt of commissions and fees as part of the "cost" of insurance, Defendants' actions were authorized under the contract as a matter of law.

But, as Plaintiff argues, if this were the rule, "it would grant unfettered license to mortgage servicers to mark-up the charges for force-placed insurance with no limit whatsoever."  Opp. to Litton & Ocwen, at 12.  Under this reasoning, "Litton and Ocwen could pay ASIC $100 for a policy on Plaintiff's property, charge Plaintiff $1,000, and pocket the difference."  Id.  This Court declines to adopt a rule that leads to such a strained reading of the covenant of good faith and fair dealing.

Litton and Ocwen resist that logical extension of their argument, but not persuasively.  They reply that Plaintiff's hypothetical would not be permitted under Anapoell, because "Anapoell holds [only] that a creditor can pass on the entire insurance premium charged by the insurance provider."  Litton & Ocwen Reply, at 9.  "Anapoell did not argue that defendant bought insurance for one price and then charged him more than that."  Id.  Such an action, Litton & Ocwen presumably concedes, would *not* be permissible.  But the only differences between that action and Plaintiff's allegations are formalistic.  Plaintiff alleges that Litton and Ocwen arranged with the insurers to *set* what would they would deem the "insurance premium charged by the insurance provider."  To adjust the hypothetical from Plaintiff's opposition brief, the complaint alleges, in effect, that Litton and Ocwen agreed with ASIC that insurance normally costing $100 on the open market, should be characterized as costing $1,000, and passed along to Plaintiff to pay.

If the deed of trust were interpreted to provide lenders with limitless discretion to set *any* amount as the "cost" of insurance, through any means, the contract would be unconscionable.  Therefore, Litton & Ocwen's discretion to assess costs must be limited in some way to the reasonable understanding contracting parties would ascribe to the words of the deed.  The Court cannot determine as a matter of law that the under all plausible interpretations of the contract, the charges Defendant are alleged to have assessed were authorized by the contract.  The breach of the

United States District Court
Northern District of California

covenant claim is especially inappropriate for Rule 12 motion practice, since it could hinge on as-yet undiscovered factual evidence.  <u>See</u> <u>Reiydelle v. J.P. Morgan Chase Bank, N.A.</u>, No. 12-cv-06543-JCS, 2014 WL 312348, at *13 (N.D. Cal. Jan. 28, 2014).

Litton & Ocwen additionally urge dismissal since the lender who signed her deed of trust was Fremont Investment & Loan, and Plaintiff has failed to plausibly allege that Litton and Ocwen became parties to her contract with Fremont.  Plaintiff alleges that Litton and Ocwen became the servicers of her loan.  It is plausible to infer that "a servicer can stand in the shoes of the party to the contract to the extent that rights are assigned." <u>Ellsworth</u>, 2014 WL 1218833, at * 20.  The Complaint plausibly alleges that this occurred.

Indeed, it is somewhat *im*plausible that the servicers acquired the rights to enforce the lender's rights under the deed of trust without becoming parties to the contract.  But the Court need not decide the question now; whether or not Litton and Ocwen have become parties to the deed of trust is "a fact issue." <u>Ellsworth</u>, 2014 WL 1218833, at * 20.  Plaintiff must produce evidence to prove Litton and Ocwen are parties to the contract, but there is nothing implausible about the allegation.

Plaintiff's complaint states a claim for breach of contract and breach of the covenant of good faith and fair dealing.

### D.    RICO

"The RICO statute sets out four elements: a defendant must participate in (1) the conduct of (2) an enterprise that affects interstate commerce (3) through a pattern (4) of racketeering activity or collection of unlawful debt." <u>Eclectic Properties East, LLC v. Marcus & Millichap Co.</u>, 751 F.3d 990, 997 (9th Cir. 2014) (citing 18 U.S.C. § 1962(c)).  "Racketeering activity, the fourth element, requires predicate acts." <u>Eclectic Properties</u>, 751 F.3d at 997.  "In addition, the conduct must be (5) the proximate cause of harm to the victim." <u>Id.</u> (citing <u>Sedima, S.P.R.L. v. Imrex Co., Inc.</u>, 473 U.S. 479, 496-97 (1985)).

Plaintiff's complaint brings three types of RICO cause of action, each of which are asserted against two pairs of Defendants.  The first, third and fifth causes of action are asserted against Defendants Litton and Southwest, and the second, fourth and sixth causes of action are

United States District Court
Northern District of California

United States District Court
Northern District of California

1   asserted against Defendants Ocwen and ASIC.  In the first two causes of action, Plaintiff asserts

2   the underlying predicate act of honest services fraud, and in third and fourth causes of action, she

3   asserts the underlying predicate act of mail and wire fraud.  Plaintiff's fifth and sixth causes action

4   are for a RICO conspiracy pursuant to 18 U.S.C § 1962(d) against both pairs of Defendants.

5        Defendants argue that Plaintiff's complaint fails as a matter of law to establish a pattern of

6   racketeering activity, to allege the existence of an enterprise, to allege conduct that caused

7   proximate harm to the victim, and to allege the existence of a conspiracy.

### 1.    Racketeering Activity

9        Counts one and two plead the "predicate act" of honest services fraud pursuant to 18

10  U.S.C. § 1346.  Counts three and four plead the "predicate act" of mail and wire fraud pursuant to

11  18 U.S.C. §§ 1341 and 1343.  The Court addresses each in turn.

### a.    Honest Services Fraud

13       RICO's honest services fraud prohibition "covers only bribery and kickback schemes."

14  Skilling v. United States, 561 U.S. 358, 368 (2010).  ASIC moves to dismiss, invoking the

15  Seventh and Eleventh Circuit's conclusions that kickbacks require divided loyalty, and lenders do

16  not owe their primary loyalty to borrowers.  Feaz, 745 F.3d at 1110; Cohen, 735 F.3d at 611.

17  While Feaz and Cohen were not RICO cases, this basic principle is well established in RICO case

18  law.

19       The theory of honest services fraud under RICO "had its genesis in prosecutions involving

20  bribery allegations."  Skilling, 561 U.S. at 408.  "Honest services mail and wire fraud cases 'rel[y]

21  on the idea that a public official acts as trustee for the citizens and the State . . . and thus owes the

22  normal fiduciary duties of a trustee, e.g., honesty and loyalty to them.'"  United States v. Garrido,

23  713 F.3d 985, 992 (9th Cir. 2013) cert. denied, 134 S. Ct. 1333, (U.S. 2014) (citing United States

24  v. Kincaid–Chauncey, 556 F.3d 923, 939 (9th Cir. 2009).

25       However, while initially "these cases . . .  involved bribery of public officials, . . . courts

26  also recognized private-sector honest-services fraud."  Skilling, 561 U.S. at 401.  The theory

27  behind private-sector honest services fraud, for example in the case of a company who bribes

28  another company's employees to turn against their employer, is that "'when one tampers with [the

employer-employee] relationship for the purpose of causing the employee to breach his duty [to his employer,] he in effect is defrauding the employer of a lawful right." <u>Skilling</u>, 561 U.S. at 401 (quoting <u>United States v. Procter & Gamble Co.</u>, 47 F.Supp. 676, 678 (D. Mass. 1942)). "'The actual deception that is practised is in the continued representation of the employee to the employer that he is honest and loyal to the employer's interests.'" <u>Skilling</u>, 561 U.S. at 401 (quoting <u>Procter & Gamble Co.</u>, 47 F.Supp. at 678) (spelling in the original); <u>see</u> <u>also</u> <u>United States v. Schwartz</u>, 785 F.2d 673, 680 (9th Cir. 1986) (private-sector honest-services fraud applies when a union official has been influenced to "compromise his integrity and position").

        For this reason, not all acts of misrepresentation can be described as a deprivation of honest services.  "[A] breach of a fiduciary duty is an element of honest services fraud under 18 U.S.C. §§ 1341 and 1346." <u>United States v. Milovanovic</u>, 678 F.3d 713, 722 (9th Cir. 2012) (en banc), <u>as amended</u> (May 22, 2012), <u>cert. denied</u>, 133 S. Ct. 929 (U.S. 2013).  A relationship meeting this definition "is not limited to a formal 'fiduciary' relationship well-known in the law, but also extends to a trusting relationship in which one party acts for the benefit of another and induces the trusting party to relax the care and vigilance which it would ordinarily exercise." <u>Id.</u> at 724; <u>see also</u> <u>United States v. deVegter</u>, 198 F.3d 1324, 1328-29 (11th Cir. 1999) ("the breach of loyalty by a private sector defendant must in each case contravene—by inherently harming— the purpose of the parties' relationship").  The duty can extend to employees as well as to "other persons who assume a legal duty of loyalty comparable to that owed by an officer or employee to a private entity." <u>Milovanovic</u>, 678 F.3d at 724 (quoting <u>U.S. v. Williams</u>, 441 F.3d 716, 723-24 (9th Cir. 2006)).

        It is not plausible to infer from the facts of the complaint that Plaintiff and any of the Defendants had developed "a trusting relationship in which one party acts for the benefit of another and induces the trusting party to relax the care and vigilance which it would ordinarily exercise." <u>Milovanovic</u>, 678 F.3d at 724.  Plaintiff seeks damages for how she claims to have been wrongly deprived of payments she believes her contract did not compel her to make.  She does not plausibly allege that she was deprived of the services of one she believed to be "honest and loyal to" her interests.  <u>Skilling</u>, 561 U.S. at 401 (quoting <u>Procter & Gamble Co.</u>, 47 F.Supp.

at 678).

Plaintiff argues that her claims are analogous to those in Milovanovic since that case also involved an arm's-length commercial relationship.  The defendants in that case were independent contractors working for a translation service agency, "which itself contracted to provide translation services to government agencies" administering tests for trucking licenses.  678 F.3d at 718.  The translators solicited and accepted bribes to assist applicants in cheating on the exams. Id.  The Ninth Circuit concluded that "an agency relationship or a relationship of trust existed between the State of Washington and [defendants]."  Id. at 724.  The defendants would have been in an agency relationship to the state had they been directly employed by the state, and the Ninth Circuit held that that analysis was not altered by the fact that the translators were independent contractors rather than full-time employees.  Id. at 725.

But the mortgage servicers in this case were not Plaintiff's agents in any comparable way. Perryman did not hire the mortgage servicers, even indirectly, to serve as agents of her interest. They certainly did not owe her the type of "legal duty of loyalty comparable to that owed by an officer or employee to a private entity."  Id. at 724.  As a general matter, "[n]o fiduciary duty exists between a borrower and lender in an arm's length transaction."  Ragland v. U.S. Bank Nat. Assn., 209 Cal. App. 4th 182, 206 (2012).  If even that normal relationship creates an agency relationship creating a duty of honest services, then it is hard to imagine what types of contractual relationships would *not* be considered to impose quasi-fiduciary duties upon the contracting parties, subjecting them to prosecution under a statute designed to punish public corruption.

Plaintiff cites no authority demonstrating that honest-services fraud extends to situations like this one, in which all the allegations of the complaint indicate the parties had an arm's-length commercial relationship, which was not comparable to an employment or other agency relationship, and in which neither reposed trust in, nor professed a duty of loyalty to, the other. Plaintiff fails to state a claim of honest services fraud.

### b.    Mail and Wire Fraud

"The mail and wire fraud statutes . . . contain three elements: (A) the formation of a scheme to defraud, (B) the use of the mails or wires in furtherance of that scheme, and (C) the

specific intent to defraud." Eclectic Properties East, 751 F.3d at 997 (citing Schreiber Distrib. Co. v. Serv-Well Furniture Co., Inc., 806 F.2d 1393, 1399 (9th Cir. 1986)).  "The intent to defraud may be inferred from a defendant's statements and conduct."  Eclectic Properties East, 751 F.3d at 997 (quoting United States v. Peters, 962 F.2d 1410, 1414 (9th Cir. 1992)).  "In the absence of direct evidence of intent, the party asserting fraud must first prove 'the existence of a scheme which was reasonably calculated to deceive persons of ordinary prudence and comprehension,' and then, 'by examining the scheme itself' the court may infer a defendant's specific intent to defraud."  Eclectic Properties East, 751 F.3d at 997 (internal citations omitted).

ASIC and Litton & Ocwen move to dismiss on the grounds that Plaintiff has failed to allege a scheme reasonably calculated to deceive from which the Court can infer a specific intent to defraud.  The Court finds that it can plausibly infer a scheme to defraud from the allegations in the complaint and other noticeable records.  In addition to representing the charges as the "cost" of obtaining substitute coverage in the deed of trust, Defendants sent other communication through the mail which could be reasonably construed as continuing to represent to Plaintiff that the charges she ran the risk of incurring would be attributable to the Defendants' actual costs of obtaining substitute insurance.  It appears that some of those communications did specifically warn Perryman that choosing not to get her own insurance would be a bad deal for her, in ways that tend to indicate Defendants were not trying to induce her to default on her coverage obligations.  But it still could be the case that the overall intent of the Defendants' representations were calculated to misrepresent the nature of the cots the lenders would pass along to lenders under the LPI clause.  Accord Cannon, 2014 WL 324556, at *2-3.  Whether or not Defendants made material misrepresentations, and  whether they intentionally created a scheme to defraud, are questions of fact.

### 3.    Enterprise

"To establish an 'enterprise,' Plaintiff must plead the existence of a 'person' and an 'enterprise' that are distinct from one another."  Living Designs, Inc. v. E.I. Dupont de Nemours & Co., 431 F.3d 353, 361 (9th Cir. 2005).  ASIC and Litton & Ocwen argue that Plaintiff has failed to plead the existence of a RICO enterprise, and has also failed to plead that Defendants

United States District Court
Northern District of California

conducted the affairs of the enterprise.

The allegations of the complaint are sufficient to plead the existence of an ongoing organization, formal or informal," and to plead that "the various associates function as a continuing unit."  United States v. Turkette, 452 U.S. 576, 580, 583 (1981); accord Cannon, 2014 WL 324556, *3.  Plaintiff alleges an ongoing collusive relationship between the insurers and the servicers in which they agreed to misrepresent the nature of the LPI charges at the lender's expense for their collective benefit.  There is nothing defective about the nature of this allegation.  The complaint alleges that this association between the Defendants is arranged for the overall benefit of this informal association and is independent from each Defendant's independent business interests.  While Plaintiff does not know, and could not reasonably be expected to know, the exact names of every entity involved in this arrangement, the complaint satisfies Rule 9(b) because the "allegations of fraud" are  "'specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong.'"  Bly-Magee v. California, 236 F.3d 1014, 1019 (9th Cir. 2001) (quoting Neubronner v. Milken, 6 F.3d 666, 672 (9th Cir. 1993)).

### 4.     Injury

Only a "person injured in his business or property by reason of a violation of section 1962 of this chapter may sue" under 18 U.S.C. § 1964(c).  This provision requires that "the defendant's violation was a 'but for' cause of plaintiff's injury, and also "requires the plaintiff to establish proximate cause in order to show injury 'by reason of' a RICO violation."  Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 654 (2008) (quoting Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 268 (1992)).

Defendants argue that Plaintiff has not shown that Defendants' actions proximately caused Plaintiff any RICO injury, primarily relying on Cohen's conclusion that the similar LPI theory of damages in that case -- "that had she known the charges were really kickbacks, she would have breached her contractual duty to pay" – was "senseless."  735 F.3d at 614.  "Losing an opportunity to breach a contract cannot constitute a cognizable fraud harm."  Id.

Cohen was not a RICO case.  But in any event, in this case, the Court concludes *supra* that

25

Plaintiff could potentially show that she suffered harm by being assessed charges that were not within the scope of her contract.  Moreover, Perryman could conceivably have declined to enter into the deed of trust in the first place had she known that the types of LPI penalties she ran the risk of incurring were attributable not the servicers' costs but rather to the servicers and insurers' manipulation of the market for insurance.  She alleges RICO injury.

### 5.   Conspiracy

"Section 1962(d) of Title 18 makes it unlawful to 'conspire to violate' RICO, which makes it unlawful, among other things, 'for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity'" Smith v. United States, 133 S. Ct. 714, 719,  n.3 (2013).  Plaintiff alleges that, in addition to violating RICO's prohibition of honest services and mail and wire fraud, the parties engaged in a conspiracy to violate RICO.

Litton, Ocwen and ASIC move to dismiss this claim because Plaintiff has failed to plead any initial RICO violation Defendants could have conspired to violate.  For reasons discussed *supra*, the Court disagrees.  ASIC also argues that the complaint fails to allege sufficient facts about the details of the conspiracy, or ASIC's awareness of the scheme.  The Court finds the allegations of the complaint sufficient to allege that the parties conspired to violate RICO.

### E.   Breach of Fiduciary Duty

Plaintiff alleges that Defendants Litton and Ocwen breached their fiduciary duty to Plaintiff, and that Defendants ASIC and Southwest aided and abetted that breach.  ASIC, Litton and Ocwen move to dismiss both of these claims on the grounds that Litton and Ocwen do not owe Plaintiff a fiduciary duty.

As a general rule, "[t]he relationship between a lending institution and its borrower-client is not fiduciary in nature." Nymark v. Heart Fed. Sav. & Loan Assn., 231 Cal. App. 3d 1089, 1093, n. 1 (1991) (citing Price v. Wells Fargo Bank 213 Cal.App.3d 465, 476-78 (1989), overruled on other grounds by Riverisland Cold Storage, Inc. v. Fresno–Madera Production Credit Association 55 Cal.4th 1169, 1182 (2013)).  "[A] financial institution owes no duty of care to a

United States District Court
Northern District of California

1   borrower when the institution's involvement in the loan transaction does not exceed the scope of

2   its conventional role as a mere lender of money." Nymark, 231 Cal.App.3d at 1096; see also

3   Rufini v. CitiMortgage, Inc., 227 Cal. App. 4th 299, 312, 173 (2014), as modified on denial of

4   reh'g (July 22, 2014) ("Rufini's factual allegations do not show that CitiMortgage's activities

5   went beyond its conventional role as a mere lender of money and therefore do not establish the

6   existence of a fiduciary duty.").

7         Defendants argue that Plaintiff has not pled facts demonstrating that the lenders and the

8   servicers exceeded their customary roles.  Plaintiff counters that she *has* alleged the servicers

9   exceeded their customary role – by making the challenged LPI assessments to her escrow account.

10  But when California courts refer to a lender becoming a fiduciary by "exceed[ing] its customary

11  role," they are referring to the formation of the relationship between the lender and borrower, not

12  to later acts that the lender seeks to challenge in a civil action.  For example, in Ragland, the Court

13  of Appeal found that a lender had not established a fiduciary relationship by telling a lender "not

14  to make her April 2008 loan payment in order to be considered for a loan modification," since

15  "[t]his advice was directly related to the issue of loan modification and therefore fell within the

16  scope of Downey Savings's conventional role as a lender of money."  209 Cal. App. 4th at 206-07.

17  The Court of Appeal distinguished this situation from Barrett v. Bank of America, 183 Cal.App.3d

18  1362, 1369 (1986), in which a loan officer gave a borrower "extensive financial and legal advice"

19  not directly related to furthering the bank's own interest.  Ragland, 209 Cal. App. 4th at 207.

20        As applied here, the complaint contains no allegations from which this court could infer a

21  similar relationship was created between the parties in which Defendants were advising Plaintiff

22  or holding themselves out as an agent of her will or a guardian of her interests.  The servicers'

23  interests in servicing the loan, and the institution of LPI, were for the servicers and the bank's

24  interests, not Plaintiff's.

25        Plaintiff argues that Litton and Ocwen owed her a fiduciary duty by managing her escrow

26  account.  California courts have held than "an escrow holder is an agent and fiduciary of the

27  parties to the escrow," but they have also said that the "agency created by the escrow is limited—

28  limited to the obligation of the escrow holder to carry out the instructions of each of the parties to

United States District Court
Northern District of California

the escrow." <u>Summit Fin. Holdings, Ltd. v. Cont'l Lawyers Title Co.</u>, 27 Cal. 4th 705, 711 (2002), <u>as modified on denial of reh'g</u> (May 15, 2002) (citations omitted).  In none of the cases cited by Plaintiff did a California court recognize a breach of fiduciary duty claim against a lender by a borrower who was party to a traditional lender-borrower relationship. "It is not uncommon for a lending institution to handle escrow functions." <u>Peterson Dev. Co. v. Torrey Pines Bank</u>, 233 Cal. App. 3d 103, 117 (1991) (citing 2 Miller & Starr, Cal. Real Estate (2d ed. 1989) § 5.1, p. 395).  If this fact alone transformed an otherwise normal lender-borrower relationship into an interaction amongst fiduciaries, it would substantially undermine the well-established principle that there can be no viable breach of fiduciary duty claim arising out of an "an arm's-length, adverse, 'normal commercial banking transaction.'" <u>Peterson Dev. Co.</u>, 233 Cal. App. 3d at 117 (quoting <u>Mitsui Manufacturers Bank v. Superior Court</u>, 212 Cal.App.3d 726, 729, (1991); <u>see</u> <u>also</u> <u>Peterson Dev. Co.</u>, 233 Cal. App. 3d at 119 ("In <u>Copesky</u>[ v. Superior Court, 229 Cal.App.3d 103, 119 (1991),] with respect to the normal commercial banking context, we cautioned against the 'loose characterization' of financial relationships as 'fiduciary, quasi-fiduciary or fiduciary like', commenting that with respect to ordinary banking transactions, 'the bank is in no sense a true fiduciary.'")

The Court acknowledges that some courts have found at least some states' breach of fiduciary duty laws sufficient to give rise to a viable claim in similar situations.  <u>See</u> <u>Cannon</u>, 917 F.Supp.2d at 1055.  But this Court finds that under California law, the complaint does not allege facts from which it is plausible to infer that the lender and Plaintiff had established a fiduciary relationship.  <u>Accord</u> <u>Gustafson v. BAC Home Loans Servicing, LP</u>, No. SACV 11-915-JST ANX, 2012 WL 7051318, at *7-9 (C.D. Cal. Dec. 20, 2012); <u>Lane v. Wells Fargo Bank, N.A.</u>, No. 12-cv-4026 WHA, 2013 WL 269133, at *10 (N.D. Cal. Jan. 24, 2013); <u>Hudson v. Wells Fargo Bank, N.A.</u>, No. 11-cv-3966 JCS, 2011 WL 5882880, at *8 (N.D. Cal. Nov. 23, 2011).  From this "[i]t follows logically that a loan servicer has no fiduciary duty to a borrower when its involvement in the transaction does not exceed the scope of its conventional role as a loan servicer." <u>Huerta v. Ocwen Loan Servicing</u>, No. 09-cv-05822 JF, 2010 WL 728223, at *4 (N.D. Cal. Mar. 1, 2010).  The claim of "aiding and abetting a breach of fiduciary duty" must therefore

28

1    fail as well.

2    **F.    Unjust Enrichment**

3         Plaintiff pleads a cause of action for "unjust enrichment."  In California "[t]here is no

4    cause of action for unjust enrichment. Rather, unjust enrichment is a basis for obtaining restitution

5    based on quasi-contract or imposition of a constructive trust."  Myers-Armstrong v. Actavis

6    Totowa, LLC, 382 Fed. Appx. 545, 548 (9th Cir. 2010) (unpublished) (citing McKell v.

7    Washington Mut., Inc., 142 Cal.App.4th 1457, 1489 (2006)); see also Hill v. Roll Intl. Corp, 195

8    Cal.App.4th 1295, 1307 (2011) ("Unjust enrichment is not a cause of action, just a restitution

9    claim").

10        Moreover, since Plaintiff has pled other claims for which restitution is a remedy, "any

11   unjust enrichment 'claim' would be purely duplicative."  Id.  Finally, an action in quasi-contract

12   "does not lie when an enforceable, binding agreement exists defining the rights of the parties,"

13   which Plaintiff claims there is in pleading her breach of contract claim.  Paracor Fin., Inc. v. Gen.

14   Elec. Capital Corp., 96 F.3d 1151, 1167 (9th Cir. 1996).

15        Plaintiff's unjust enrichment claim fails as a matter of law.

16   **G.    UCL**

17        Plaintiff's twelfth claim for relief arises under California's Unfair Competition Law

18   ("UCL"), Cal. Bus & Prof. Code § 17200, et seq., which has three prongs, prohibiting "unlawful,"

19   "unfair," and "fraudulent" practices.  Since Plaintiff has validly pled a RICO claim, she has pled a

20   UCL claim under the "unlawful" prong.  Defendants move to dismiss this claim insofar as it

21   alleges a "fraudulent" practice, since they maintain that the alleged representations were not

22   misstatements.  The Court rejects that argument for the same reasons discussed supra.

23        Defendants also moved to dismiss the UCL claim under the "unfair" prong for two

24   additional reasons.  First, they argue that courts reject such "unfair" claims where the consumer

25   could reasonably have avoided the challenged harm by taking alternative action.  See Davis, 691

26   F.3d at 1170 (rejecting "unfair" prong claim where plaintiff was warned that credit card

27   "restrictions might apply" and "had the opportunity to cancel the account for a full refund").

28   Plaintiff, of course, had the opportunity to purchase insurance at her own cost and could therefore

United States District Court
Northern District of California

United States District Court
Northern District of California

1   could have avoided the LPI charges.  While the Court has some sympathy for this argument, the

2   wrong Plaintiff seeks to redress is the harm of expecting that she would, if she defaulted on her

3   obligation, only be charged the costs the servicers actually incurred in seeking replacement

4   insurance.  She could not reasonably have avoided that harm without knowing how the Defendants

5   allegedly conspired to set the rates for LPI.

6          ASIC also cites those California courts which have interpreted an "unfair practices" claim

7   to "require that the public policy which is a predicate to the action must be 'tethered' to specific

8   constitutional, statutory or regulatory provisions." In re Ins. Installment Fee Cases, 211 Cal. App.

9   4th 1395, 1418 (2012) (quoting Gregory v. Albertson's, Inc., 104 Cal. App. 4th 845, 853 (2002)).

10         ASIC notes that Plaintiff's complaint fails to cite any such specific provision to which her

11  UCL claim is tethered.  In her opposition brief, Plaintiff cites 12 U.S.C. § 2605(m), which

12  provides that "All charges, apart from charges subject to State regulation as the business of

13  insurance, related to force-placed insurance imposed on the borrower by or through the servicer

14  shall be bona fide and reasonable."

15         ASIC objects that this argument does not appear in the complaint.  A plaintiff may not seek

16  to incorporate new facts into her complaint during motion practice, but she certainly may make

17  legal argument supporting the viability of her claims.  Citing the provision to which her claim is

18  tethered is legal argument, not factual allegation.  While it is probably better practice to cite in the

19  complaint the specific constitutional, statutory or regulatory provisions underlying an "unfair

20  practices" claim, it may be done in an opposition brief rather than in the complaint itself.

21         **H.      Conversion**

22         Litton & Ocwen move to dismiss Plaintiff's cause of action for conversion.  "Conversion is

23  the wrongful exercise of dominion over the property of another."  Mendoza v. Continental Sales

24  Co., 140 Cal. App. 4th 1395, 1404-05 (2006).  Here, the property Plaintiff claims Litton & Ocwen

25  have wrongfully exercised dominion over is money.  "Money cannot be the subject of a cause of

26  action for conversion unless there is a specific, identifiable sum involved, such as where an agent

27  accepts a sum of money to be paid to another and fails to make the payment."  PCO, Inc. v.

28  Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP, 150 Cal. App. 4th 384, 395

(2007) (quoting McKell v. Washington Mutual, Inc., 142 Cal. App. 4th 1457, 1491 (2006). "California cases permitting an action for conversion of money typically involve those who have misappropriated, commingled, or misapplied specific funds held for the benefit of others," while "actions for the conversion of money have not been permitted when the amount of money involved is not a definite sum." PCO, Inc., 150 Cal. App. 4th at 396.

Here, Plaintiff cites no definite sum, and appears to regard the property that is subject to her conversion claim to be coterminous with her immediate damages. ¶ 1, 17. In PCO, the Court of Appeal "reject[ed]" the contention that the actual amount owed "is properly for a jury to determine," and held that where a plaintiff "could only estimate the amount of cash," summary adjudication of plaintiff's conversion claim was warranted. 150 Cal.App.4th at 395, 397. In her opposition, Plaintiff fails to respond to the implications PCO and related California case law have on her conversion claim. While she argues that two courts of this district have allowed conversion claims to proceed past the pleading stage in LPI cases, it does not appear that either court had occasion to consider the argument Litton & Ocwen raise here. See Lane, 2013 WL 269133, at *11; Cannon, 917 F.Supp.2d at 1053-54.

Plaintiff fails to plead a viable claim of conversion.

**I.      Claims against Ocwen**

Finally, Litton & Ocwen moves to dismiss the claims against Ocwen, since Plaintiff is suing Ocwen "in its capacity as successor in interest to Litton," ¶ 3, and Defendants argue she has failed to allege sufficient facts in support of that allegation.

Plaintiff alleges that "Litton transferred the servicing rights to this loan to Ocwen," ¶ 3, that Ocwen's parent company purchased Litton and agreed to certain indemnification provisions for the benefit of Litton, including claims arising out of the force-placed practices complained of in this action, ¶ 24, and that Litton transferred and merged its servicing operations with Ocwen, ¶¶ 3, 37. Proving that Ocwen has become Litton's successor will require proof, of course, but there is nothing implausible about the allegations in the complaint.

**IV.      CONCLUSION**

Southwest's motion to dismiss is GRANTED. All causes of action are DISMISSED

United States District Court
Northern District of California

1   WITHOUT PREJUDICE to the extent they are pled against Defendant Southwest.

2          Litton & Ocwen's motion, and ASIC's motion, are GRANTED IN PART and DENIED IN

3   PART.  The tenth claim for relief, for unjust enrichment, is DISMISSED WITH PREJUDICE,

4   since the Court concludes that it fails as a matter of law.  The first, second, seventh, eighth, and

5   eleventh claims for relief are DISMISSED WITHOUT PREJUDICE.  Plaintiff has leave to re-

6   assert those claims for relief in an amended complaint if she can allege additional facts not pled in

7   the operative complaint which remedy the deficiencies identified in this order.  Plaintiff must file

8   any such amended complaint within 21 days of this order.  Failure to meet this deadline or comply

9   with the Court's order may result in dismissal with prejudice of those claims pursuant to Rule

10  41(b) of the Federal Rules of Civil Procedure.  Plaintiff must, with any amended complaint,

11  include a separate document detailing the new factual allegations she has added to the complaint

12  to overcome the deficiencies described in this order.

13         **IT IS SO ORDERED.**

14  Dated:  October 1, 2014

15                                                    _____

16                                                              JON S. TIGAR
                                                       United States District Judge
17

18

19

20

21

22

23

24

25

26

27

28